**Will BRATTON, Appellant,**

**v.**

**AMERICAN MUTUAL LIABILITY INSURANCE COMPANY, Appellee.**

**No. 292.**

Court of Civil Appeals of Texas.

Tyler.

Oct. 5, 1967.

Barber, Seale & Stover, John H. Seale, Jasper, for appellant.

Keith, Mehaffy & Weber, Beaumont, Robert Q. Keith, Beaumont, of Counsel for appellee.

SELLERS, Justice.

We take the following from Appellant's Brief:

"This is a workmen's compensation case, in which the plaintiff sought benefits for an injury sustained on April 19, 1966 while working for Hal Land in San Augustine County, Texas. Coverage was with the defendant, and all matters were stipulated except injury, extent and duration of disability, and the question of whether the disability was due solely to prior causes. The jury found that the plaintiff sustained an injury, sustained no total incapacity, and two weeks of partial incapacity beginning on April 19, 1966, with a wage earning capacity during partial incapacity of $32.50 a week, and the disability was not due solely to prior causes. Average weekly wage had been stipulated at $65.00 a week, and the Trial Court therefore rendered a judgment based on the jury verdict, awarding the plaintiff the total amount of $40.56. Appellant has duly perfected this appeal from the order of the Trial Court overruling his motion for new trial. In this Brief, the

parties will be referred to by their trial court designations.

## "POINTS OF ERROR

### "FIRST POINT

"The Trial Court erred in entering Judgment based on the jury's answer to Special Issue No. 5 of the Court's Charge, because such answer is so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust.

### "SECOND POINT

"The Trial Court erred in entering Judgment based on the jury's answer to Special Issue No. 10 of the Court's Charge, because such answer is so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust.

### "STATEMENT UNDER FIRST AND SECOND POINTS OF ERROR

"Special Issue No. 5 of the Court's Charge was conditioned on an affirmative answer to Special Issue No. 4 (which the jury did answer affirmatively), and Special Issue No. 5 was as follows:

'Do you find from a preponderance of the evidence that any of such incapacity, if any you have found, was total?'

"The jury answered Special Issue No. 5 'No'.

"Special Issue No. 10 was conditioned on an affirmative answer to Special Issue No. 8 (which the jury did answer affirmatively), and Special Issue No. 10 was as follows:

'What do you find from a preponderance of the evidence to be the duration of such partial incapacity, if any you have found?'

"The jury answered Special Issue No. 10 '2 weeks'."

The appellant, on April 19, 1966, was a member of a crew working for Hal Land in San Augustine County hauling logs from the woods. The logs were of various lengths up to 40 feet, and from one to two feet in diameter. Briefly stated, the logs were snaked out of the woods and placed in piles and then the truck was drawn up alongside of the pile, and loading of the truck takes place. The first thing done is to place a log alongside the wheels of the truck on the side where the pile of logs is stacked, and the actual lifting of the logs onto the truck is done by machinery operated on the opposite side of the truck being loaded by means of a cable with tongs hooked to each end of the logs to be loaded. Then this cable would be tightened from the opposite side of the truck, pulling the log from the stack over against the log placed against the wheels of the truck and then on up onto the bed of the truck. On April 19, 1966, the appellant was hooking tongs to one end of the logs being loaded. At the time of the accident the truck had been loaded, and appellant and another member of the crew were in the process of tying a chain or cable around the logs on the truck so that they would not fall off. During this process, appellant was standing about midway between the front and back of the loaded truck on the side where the logs lay against the wheels. A log was moved behind appellant over against the log where he was standing, catching appellant's leg and foot between the two logs. Appellant got his foot loose and being asked if it hurt him, said that it did. However, he worked on until noon, this happening about ten o'clock in the morning, but did not work in the afternoon. Appellant did not desire to see a doctor at the time but said he would just wait until quitting time to go in to town. That evening, when they went in to town, one of Mr. Land's hands with whom appellant rode in, carried him to a doctor who was not in, so he was carried to Dr. Buchele who x-rayed and examined appellant and found no broken bones and only some swelling in the leg, and gave him a prescription for medicine

which the appellant did not have filled. The next day one of Mr. Land's employees called on appellant to see if he needed anything, and appellant asked him to get his money for his work, which the employee did. Two days after appellant was injured, he filed a claim with the Industrial Accident Board for compensation, and on May 2, 1967, was sent to Dr. Dickerson by his attorney for examination. Here is appellant's version of the accident as given on the trial and as related to Dr. Dickerson:

"Q   Now then, tell me just how it was that you got hurt?

"A   Well, we was binding the truck down. The truck driver throwed the cable across. Quite naturally, I was on this side fixing to pass it back and then the log hit me. It knocked me down across the wheel log. I didn't know what happened at the time. I jumped around there and got aloose and then I seen what had happened.

"Q   Well now, you were facing which way now?

"A   I was facing the truck and the log just like that to the truck, and the log come from behind.

"Q   All right, and where—you say the log came from behind you?

"A   Yes, sir.

"Q   Where did it come from?

"A   It come from back off a pile of logs behind me.

"Q   It was on a pile of logs?

"A   Yes, sir, behind me, with tongs.

"Q   Now, how high would this pile of logs be, Will?

"A   Well, possibly—I couldn't exactly say—some four or five or six logs thick.

"Q   Four or five or six logs high?

"A   Piled up, you know, in there.

"Q   Now, what size logs are we talking about?

"A   We're talking about pretty good logs. That log would be like that. (Indicating)

"Q   How long *longs* were these?

"A   Well, we was cutting forty foot logs and thirties, like that, I don't know just exactly whether that was one of the forties or something longer or something shorter. It was a long log.

"Q   Now, this log that hit you, were the tongs hooked into it?

"A   Yes, sir.

"Q   Who had hooked those tongs in there?

"A   We left them hooked. We always left them. I left one and Mr. Jake left another. We always left them hooked in there.

"Q   And who was running the equipment that controlled this?

"A   Mr. Hal.

"Q   Mr. Hal was running the equipment?

"A   He was running it.

"Q   And in running that equipment, what does he do? Does he make the lines tight and pull the logs?

"A   Yes, sir, he pick up the logs and set them on the truck. He run the loader.

"Q   And you had your—you were facing the truck which would put your back to where the logs were coming from?

"A   Yes, sir, it put my back to the log.

"Q Now, what part of your body did the log hit?

"A *He* me right here in the back and went down my hips and then caught my legs.

"Q You're pointing down to the lower part of your back around your belt line?

"A Yes, sir. Of course, that knocked me under the truck you see.

"Q And now did that—did you go all the way to the ground or did you go against the truck?

"A Went all the way down to the ground with my hand, bumped my head on the coupling pole when I went under.

"Q Bumped your head on what?

"A Coupling pole.

"Q Coupling pole?

"A Yes, sir, knocked me through under the truck.

"Q Now, you're—as I understand it, you fell forward?

"A Yes, sir, fell forward.

"Q And so your hands hit the ground, is this right?

"A Yes, sir.

"Q As a result of that, when you started to try to get up, was your right foot pinned between a couple of logs?

"A Yes, sir, my leg was pinned. I twisted around and got out.

"Q You had to twist around to get out?

"A I had to twist clean around, twisted to get out.

"Q Now, did you have a big bruise or mark of some kind on your right ankle, down in there?

"A I had a big blood-shot scarred place.

"Q Now then, what happened right after this, were you taken to see the doctor?

"A No, sir.

"Q Did you stay out in the woods the rest of the day?

"A Stayed there the rest of the day. I hopped around there a little until noon trying to do something. Quit for noon. I never got to do no more. I was paralyzed.

"Q What did you do then in the afternoon?

"A I just set there in the pickup truck until they quit.

"Q You sat there and did what?

"A Set there until they quit, quitting time.

"Q Did you say you sat there in a pick-up truck?

"A Yes, sir.

"Q Whose was that, Mr. Land's truck?

"A Yes, sir, Mr. Land's truck.

"Q Quitting time was what, four or five o'clock in the afternoon?

"A To my recollection, I reckon we quit sometime around four o'clock.

"Q Well, anyway—

"A I didn't have no way of knowing, but we was in here around five o'clock.

"Q All right. And did you come on into town here in San Augustine?

"A Yes, sir.

"Q And did somebody take you to the doctor?

"A Yes, sir, he sent me up there by one of the employees.

"Q Mr. Land sent you to the doctor by one of his employees?

"A Yes, sir.

"Q Did he send you to see Dr. Buchele here in San Augustine?

"A Yes, sir.

"Q You had never seen Dr. Buchele before?

"A No, sir.

"Q And what did Dr. Buchele do?

"A Well, Dr. Buchele sent me in there with the nurses and they would—he said x-ray the leg and told me it wasn't broken. That's what he told me, but they done that, Dr. Buchele didn't do that.

"Q In other words, he had the nurses X-ray your foot?

"A The nurses done that.

"Q And he told you it wasn't broke?

"A Yes, sir, he told me it wasn't broke.

"Q Did he give you any examination other than X-raying the foot?

"A No, sir, didn't touch me nowhere else.

"Q Now, did he give you some kind of prescription for medicine?

"A He give me a prescription but it never was filled. I didn't have nothing to fill it with.

"BY MR. SEALE: Mark this please.

(Reporter marks prescription P–6)

"Q Now, you say you can't read, but anyway whatever prescription he gave you, did you give that to me?

"A I sure did.

"Q Now then, Dr. Dickerson has testified here that you came to see him on the 2nd of May?

"A Yes, sir.

"Q Which would have been about two weeks after you got hurt, is that right?

"A Yes, sir.

"Q And he's also testified I sent you over there to see him?

"A That's right.

"Q You had never seen or heard of Dr. Dickerson before?

"A No, sir, hadn't never seen him before.

"Q All right. And then Dr. Dickerson put you in the hospital the first day he saw you?

"A Yes, sir.

"Q Now then, what kind of treatment did you get while you were in the hospital the first time?

"A Well, he give me real good treatment. I was in those traction, laying down with them weights on me.

"Q Uh huh.

"A I stayed in there all of the time I was in there, and then—

"* * *"

Dr. Buchele testified that appellant's only complaint to him was of his foot and leg which he X-rayed and found no broken bones and made no other examination of his body.

Dr. Dickerson testified that he saw appellant on May 2 and immediately placed him in the hospital with traction:

"Q All right, sir. Tell me if you will what is the first part of a usual examination a doctor performs?

"A It's taking a history, trying to find out what's happened.

"Q In other words, letting the man tell you what he says happened and what he's complaining of?

"A Yes, sir.

"Q In medical terms this is known as taking a history?

"A Yes, sir.

"Q Did you take a history from Will Bratton when you first saw him?

"A Yes, I did.

"Q Again if you wish, you may refer to your notes, and tell me the history he gave you, Doctor?

"A Briefly, I believe a log hit his right leg, knocked him down, injured his right leg and hip and lower back. This happened on April 19, 1966. He has not been able to work since.

"Q Sir?

"A And he has not been able to work since.

"Q All right. You saw him then on May 2, which would be some two weeks or so after his April 19 occurrence?

"A Yes, sir, this is correct.

"Q Then following the taking of a history did you perform an examination on Will Bratton?

"A I did.

"Q If you will, Doctor, just tell me what that examination consisted of and what your findings were?

"A Of course, it was primarily limited to the areas of his body he was complaining about, and, of course, this was his lower back, his foot, and we had loss of motion in the lower back, limitation from side to side and forward· and backward.

There was pain and spasm in his lower back, some tenderness.

"Q Now, Doctor, let me interrupt you right there. What do you mean by spasm in the lower back?

"A This is an involuntary contraction of the muscles.

"Q When you say involuntary contraction of the muscles, that means this is something that the patient has no control over?

"A This is correct, yes, sir.

"Q Now, doctors have what they call objective findings and subjective symptoms, is this correct?

"A Yes, sir.

"Q Will you, if you will, please, doctor, just tell the jury what you mean by that? What the difference is between the two?

"A Well, subjective findings or symptoms is what the patient tells you he hurts or feels, and objective is generally thought of as something that the doctor can see or feel or measure himself.

"Q What is muscle spasm in the lower back? Is that objective or subjective?

"A This is an objective finding.

"Q Something that the patient has no control over?

"A This is correct, yes, sir.

"Q Now then, Doctor, what—what does a finding of muscle spasm in the lower back, what does that generally indicate to you as a doctor?

"A There's pain in this area and this is Mother Nature's way of putting a splint here to keep movement down to prevent further pain.

"Q Now then, you talked about limitation of motion that you found in this patient, what do you mean by that?

"A Limitation of motion in muscles of his hips, movement of the body trunk from the hips, that is, stooping, bending, twisting were rather inadequate.

"Q And then what do you mean when you say tenderness?

"A This is pain upon pressure.

"Q All right. To an experienced examiner, a doctor who has had many years of experience in examining people, is tenderness a completely subjective thing or is it some of both? In other words, can the examiner tell it it's really hurting when you press?

"A It's primarily a subjective finding and you can never completely eliminate the subjective aspect in this thing, but you can usually tell when your patient is over exaggerating symptoms and how much of it is genuine pain or whether or not he's over exaggerating. Lot of this is a question of judgment, but this business of tenderness is primarily a subjective complaint.

"Q In your judgment in this case, was there ever any indication he was over exaggerating?

"A No, sir, I don't think so.

"* * *"

On cross-examination, the doctor testified:

"Q The story he related to you that a log hit him in the leg?

"A I believe so. Foot—leg—right leg.

"Q We're getting to pretty close ground here now, make sure of what your—what your facts are.

"A All right, sir. Log hit his right leg jerking him to the ground.

"Q Let's stop right there. Log hit right leg jerking him to the ground?

"A Yes, sir.

"Q Okay. And then based on that history and based on the facts which you found, you concluded that he had this sprain or strain of his back?

"A Yes, sir.

"Q If that history is false, then your conclusions might also be weak, is that right, Doc?

"A Yes, sir.

"Q They are based on the fact—

"A Yes, sir.

"Q —on the assumption the man was telling you the truth?

"A Yes.

"Q Now, you noted a bruise on his right leg. Where? Can you give us some idea?

"A On the instep.

"Q On the instep of his foot? Is that where it was?

"A Yes, sir.

"Q Did you take any X-rays of his foot?

"A No.

"Q I assume it got all right?

"A It didn't give him any trouble at all.

"Q All right. And it's not giving him any trouble today?

"A No, sir.

"Q Did he have any real disability from his foot the first time you saw him?

"A No, sir.

"Q  *Sofaras* the foot injury is concerned, there's nothing wrong with him?

"A  No, sir.

"Q  Doc, if he didn't get hit in the leg, if the log just brushed against his foot as opposed to his leg, and if he wasn't knocked to the ground as he has told you—

"A  Yes, sir.

"Q  —would you then assume that whatever condition he's got in his back was caused by the arthritis and not by some injury?

"A  It would certainly be mitigating circumstances all right. Yes, sir, sure would.

"*  *  *"

Dr. Buchele saw appellant again about the time of the trial and testified from his examination that he could not say whether appellant was hurt or not.

There was an eye witness to appellant's injury and his evidence is to the effect that the log which hit appellant was only moved some two or three feet sliding on the ground; that appellant was not knocked to the ground and that the log only struck the foot and leg below the knee, and appellant released himself from the log and complained only of his foot hurting him at the time.

After reviewing the entire statement of facts, this Court is of the opinion that the assignments of appellant must be overruled. This Court in a recent opinion by Chief Justice Dunagan has stated the rule governing this Court when the assignment seeks to reverse a case based on the preponderance of the evidence being against the jury's verdict, and we are following that case here. Royal v. Cameron, Tex.Civ.App., 382 S.W. 2d 335.

The judgment of the trial court is affirmed.